C. BRUNO & SONS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10022. Promulgated November 12, 1928.

*Benjamin Lesser, Esq.*, and *Michael S. Lobenthal, C. P. A.*, for the petitioner.
*James A. O'Callaghan, Esq.*, for the respondent.

OPINION.

ARUNDELL: In claiming special assessment counsel for petitioner rely upon these three points: (1) abnormal profits on impounded goods; (2) low salaries paid officers; and (3) capital employed was largely borrowed. We will consider the several points in the order stated.

1. It is claimed that net income was abnormally high because of extra large profits on goods impounded in Europe from 1916 to 1919, and finally released in the latter year and sold in 1920 and 1921. The

chief difficulty we find with the evidence on this point is the lack of complete and accurate figures. All that is given that is certain is the cost of the foreign merchandise and the net sales, i. e., gross sales less discounts and returns and allowances. It was testified that profits realized from this merchandise amounted to from $90,000 to $110,000 above normal profits, and that normal profits were from 33⅓ to 40 per cent of cost. Using 35 per cent as an average normal profit and applying it to cost gives, in round numbers, $13,600 normal profit, which, added to cost of approximately $39,000, gives $52,600 as the normal gross sales price. Adding to this the $110,000, the outside figure given as the excess over normal profits, we have $162,-600 as the possible gross selling price, all of which represented gross profit due to the fact that the cost was charged off in prior years. Again it was testified that the selling price for this kind of goods in the taxable years were from 200 to 300 per cent above the regular prices. Using again the outside figure of 300 per cent applied to the normal selling price of $52,600, we have $210,400 as the possible gross selling price. The net sales in the taxable years amounted to over $3,500,000. On the basis of sales of the foreign merchandise in the amount of $162,600, they amounted to less than 5 per cent of the total sales, and using the higher figure of $210,400, they amounted to only 6 per cent of the total sales. Taking either set of figures, we still do not know the sales expenses and other expenses properly chargeable against the sales price and so we can not determine to what extent income was affected by the sale of the foreign merchandise. We realize that the figures we have used are open to the serious objection of inaccuracy, but in making the computation we have taken the figures and amounts most favorable to the petitioner, have disregarded the fact that from 10 to 15 per cent of the impounded goods were sold in a year prior to the years in controversy, and we are still unable to find that the sale in the taxable years of this merchandise resulted in any abnormality.

2. Petitioner claims that the salaries paid its officers were unusually low compared with salaries paid by others in a similar line of business. There is testimony in the record that, based on volume of sales and considering the duties which would ordinarily be performed by an officer of a concern of this type, reasonable salaries would be much larger than those paid by petitioner. This testimony, however. was given without accurate information as to the condition of petitioner's business and of the duties performed by its officers. We ascribe to it no great weight. From the evidence it may be inferred that the salaries paid were not greater because of the fact that petitioner's board of directors was controlled by the Alien Property Custodian, but of this we can not be sure for it is not shown what the salaries

were either before or after the period of the Alien Property Custodian's control. We can find no abnormality on this ground.

3. It is claimed that the petitioner had only a small amount of invested capital and that it was enabled to transact the volume of business which it did because a large portion of capital was borrowed and could not be reflected in invested capital for profits-tax purposes. We do not know what petitioner's invested capital was during the taxable years. As to the borrowings, all we know is that for 1920 they averaged $63,701.49, at December 31, 1920, they stood at $75,000, and at December 31, 1921, they amounted to $223,000. How this borrowed money was used in the business and to what extent it contributed to income is not shown. Petitioner's claim to special assessment on this ground can not be sustained.

*Judgment will be entered for the respondent.*